HIGH PLAINS WIRELESS,
L.P., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee.

Digital PCS, LLC and Tritel
Communications, Inc.,
Intervenors.

No. 00–1292.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 2001.

Decided Jan. 11, 2002.

600

Eliot J. Greenwald argued the cause and filed the briefs for appellant.

Stanley Scheiner, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were Jane E. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, and Thomas Chandler, Counsel.

Thomas Gutierrez argued the cause for intervenors Digital PCS, LLC and Tritel Communications, Inc. With him on the joint brief was Russell D. Lukas.

Before: GINSBURG, Chief Judge, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge GINSBURG.

GINSBURG, Chief Judge:

High Plains Wireless, L.P. appeals an order of the Federal Communications Commission awarding 32 licenses to Mercury PCS II, LLC, now called Tritel Communications, Inc. High Plains and Mercury both bid at an auction conducted by the Commission for licenses to provide personal communications services (PCS). *See Mercury PCS II, LLC,* 15 F.C.C.R. 9654, 2000 WL 708679 (2000) (*Mercury*). High Plains asserts that the Commission unreasonably refused to disqualify Mercury from receiving the licenses even though Mercury concededly violated the Commission's rule against collusion. High Plains also alleges that Mercury orchestrated a slew of unlawful ex parte contacts in an attempt to influence the investigation into its bidding practices. We hold that, insofar as High Plains has standing to appeal, it has not shown that the award to Mercury was arbitrary or irrational, and we therefore affirm the order of the Commission.

## I. Background

Broadband PCS is a group of technologies that allow mobile communication using the electromagnetic spectrum. *See Amendment of the Comm'n's Rules to Establish New Personal Comms. Servs.,* 8 F.C.C.R. 7700 at ¶ 24, 1993 WL 429028 (1993) (*2d R&O*). Advanced cellular telephones, portable facsimile machines, and many other methods of wireless communication are based upon broadband PCS. *See id.* at ¶ 18. Recognizing the commercial and technological potential of broadband PCS, the Commission reserved 120 MHz of spectrum for provision of these services. *See* 47 C.F.R. § 24.200.

Before a party may use the spectrum to provide broadband PCS, it must get a license from the Commission. *See* 47 U.S.C. § 301. In 1993 the Congress directed the Commission to choose between mutually exclusive applications for a license through a system of competitive bidding, *see* 47 U.S.C. § 309(j)(1); 47 C.F.R. § 24.701; the Commission has since held several of the highest value auctions in history. *See* Remarks of then-Chairman Reed Hundt at the Inst. for Int'l Econ., Washington, D.C. (Oct. 23, 1996), *at* http://www.fcc.gov/Speeches/Hundt/spreh647.txt (visited Dec. 18, 2001) (comparing himself to Genghis Khan as one of the "most profit-generating" officials ever).

The Commission divided the 120 MHz of spectrum reserved for broadband PCS in two ways. First, it partitioned the spectrum into six blocks: three of 30 MHz each (A, B, and C) and three of 10 MHz

each (D, E, and F). *See 2d R&O* at ¶ 56. Second, it divided the spectrum into geographic service areas. Licenses for the A and B blocks of spectrum were established for each of the 51 Market Trading Areas into which the United States and its territories were divided in the RAND MCNALLY COMMERCIAL ATLAS & MARKETING GUIDE (1992). *See id.* at ¶ ¶ 64, 76. Licenses for the C, D, E, and F blocks were established for each of the 493 Basic Trading Areas (BTAs) defined by the same source. *See id.* Between August 26, 1996 and January 14, 1997 the Commission auctioned off the D, E, and F block licenses in all 493 BTAs. *See Mercury,* 15 F.C.C.R. 9654 at ¶ 2.

The DEF auction was open, simultaneous, and ascending. That the auction was "open" means that, in contrast to a sealed-bid auction, the participants became aware of each others' bids as they were cast. The auction was "simultaneous" in that the D, E, and F licenses for each of the 493 BTAs were open for bidding at the same time, and the auction was "ascending" in the sense that bidding on the licenses continued through successive rounds until no new high bid was cast. The Commission built these features into the auction to maximize the revenue it would generate and the allocative efficiency it would achieve. *See generally* Peter Cramton, *The Efficiency of the FCC Spectrum Auctions,* 41 J. L. & ECON. 727, 728–35 (1998). Because the bidding was open, however, any bidder could send all other bidders a message encoded in the digits of its bid. *See* Peter Cramton & Jesse A. Schwartz, *Collusive Bidding: Lessons from FCC Spectrum Auctions,* 17 J. REG. ECON. 229, 237 (2000). In this way, participants could collude through the auction process itself.

Mercury and High Plains both bid on the licenses for the F block of spectrum in Lubbock and for the D and F blocks in Amarillo, Texas. *See Mercury,* 15 F.C.C.R. 9654 at ¶ 2. High Plains was the successful bidder for the F block license in Amarillo. *See id.* at ¶ 2 & n. 9. Mercury acquired the F block license in Lubbock as well as 31 other licenses for which High Plains did not bid. *See id.* at ¶ 2 & n. 10.

Mercury used so-called "reflexive bidding," a tactic for deterring would-be competitors from bidding on a particular license, to dissuade High Plains from bidding on the F block license for Lubbock. *See id.* at ¶ 5 & n. 23. Specifically, Mercury made the last three digits of its bids for the F block licenses in Lubbock and in Amarillo the same as the Commission's numeric designations for the Amarillo and Lubbock BTAs respectively. *See Mercury PCS II, LLC,* 13 F.C.C.R. 23755, ¶ 3, 1998 WL 546365 (1998) (*NALF Rescission*). In one round of the auction, for example, Mercury bid $1,375,013 on the F block license in Lubbock, "013" being the BTA for Amarillo; after High Plains bid again for the F block license in Lubbock, Mercury bid $1,615,264 on the F block license in Amarillo, "264" being the BTA for Lubbock. *See id.* By repeatedly thus encoding its bids, Mercury was able to warn High Plains that if High Plains did not stop bidding, then Mercury would drive up the price of the F block license in Amarillo. *See id.* at ¶ 4.

The message was not lost on High Plains, which stopped bidding for the F block license in Lubbock, *see id.,* and filed with the Commission an emergency motion to disqualify Mercury from the auction. High Plains alleged that Mercury violated the anti-collusion rule, which prohibited bidders "from cooperating, collaborating, discussing or disclosing in any manner the substance of their bids or bidding strategies" during the auction. 47 C.F.R. § 1.2105(c) (2000), *amended by Competitive Bidding Procedures,* 66 Fed. Reg. 54447, 54447–48 (Oct. 29, 2001). When the

auction ended without the Commission having acted upon the motion, High Plains filed a motion to deny the award to Mercury of any licenses in the DEF auction. During ensuing investigations conducted separately by the Commission and by the Department of Justice, the executive responsible for formulating Mercury's bidding strategy admitted that Mercury had used reflexive bidding to threaten other bidders. *See Mercury,* 15 F.C.C.R. 9654 at ¶ 16 n. 57. Mercury claimed, however, that reflexive bidding was a common practice and did not violate the rule against collusion. *See NALF Rescission,* 13 F.C.C.R. 23755 at ¶ 4.

While the investigation into Mercury's bidding practices was ongoing, High Plains again complained to the Commission, this time about ex parte contacts between Members of Congress and the staff of the Commission. At least 27 Members inquired of the Commission about Mercury's licenses and the delay in their award. After yet another investigation, the Office of General Counsel (OGC) dismissed the charge, finding that the contacts were all congressional "status inquiries" exempt from the ban on ex parte contacts under the Commission's rules. 47 C.F.R. § 1.1202(a).

Also while the investigation into Mercury's bidding practices was ongoing, the Wireless Telecommunications Bureau (WTB) of the Commission awarded Mercury all but nine of the licenses for which the company was the high bidder. *See Mercury PCS II, LLC,* 13 F.C.C.R. 5756, 1997 WL 484634 (1997) ¶ 1. When the investigation was over, the Commission imposed upon Mercury a $650,000 forfeiture, *see Notice of Apparent Liability for Forfeiture,* 12 F.C.C.R. 17970, ¶ 1, 1997 WL 667991 (1997) (*NALF Order*); the WTB granted Mercury the remaining nine licenses, including the F block license for Lubbock; High Plains filed an application

for review of that order; and the Commission rescinded its earlier forfeiture order. *See NALF Rescission,* 13 F.C.C.R. 23755 at ¶ 1. In the rescission order, the Commission found that Mercury was not on notice that reflexive bidding would violate the rule against collusion, *see id.* at ¶ 10, and therefore declined to punish the company. *See id.*

The Commission consolidated High Plains' applications to review (1) the OGC's determination that Mercury had not violated the ban against ex parte contacts and (2) the WTB's award of licenses to Mercury, and affirmed on both counts. *See Mercury,* 15 F.C.C.R. 9654 at ¶¶ 13, 26. It also rejected High Plains' new contention that Mercury had shown a lack of candor during the investigations into its bidding practices so egregious as to disqualify it from holding a Commission license. *See id.* at ¶¶ 14–21. High Plains appealed to this court and Mercury intervened in the case.

## II. Analysis

High Plains presents three issues on appeal. First, it challenges the Commission's award of licenses to Mercury on the ground that Mercury violated the rule against collusion and the Commission had so held. Second, High Plains asserts that this court should reverse the decision of the Commission because it erred in holding that Mercury did not violate the rules against ex parte communications. Third, High Plains renews its claim that Mercury exhibited a disqualifying lack of candor. We turn to these claims only after considering whether High Plains has standing under Article III of the Constitution of the United States to bring this appeal. *See Steel Co. v. Citizens for a Better Env.,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *see also United Transp. Union–Ill. Legis. Bd. v. Surface Transp. Bd.,*

175 F.3d 163, 165 (D.C.Cir.1999) ("[W]e must determine whether the court has jurisdiction of the case before we may turn to the merits").

A. Standing and Jurisdiction

The Commission and Mercury, which has intervened, advance numerous arguments that High Plains is without standing to assert some or all of its claims on appeal. We consider the objections of the litigants, fully aware of our independent obligation to be sure we have jurisdiction.

The "irreducible constitutional minimum" that High Plains must show for standing to maintain this appeal is that it suffered an injury in fact, that the conduct of which it complains caused the injury, and that a favorable decision of this court would redress the injury. *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 231–32 (D.C.Cir. 2000). This court has had occasion in prior cases to tailor the application of these prerequisites specifically to complaints arising from the Commission's auctions of spectrum. We have held that "[a] bidder in a government auction has a 'right to a legally valid procurement process'; a party allegedly deprived of this right asserts a cognizable injury." *Id.* at 232 (quoting *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829 (D.C.Cir.1997)). A disappointed bidder need not show that it would be successful if the license were auctioned anew, but only that it was able and ready to bid and that the decision of the Commission prevented it from doing so on an equal basis. *See id.* The bidder may satisfy the requirement of redressability by showing that " 'it is ready, willing, and able' to participate in a new auction should it prevail" in court. *Id.* (quoting *Orange Park Fla. T.V., Inc. v. FCC*, 811 F.2d 664, 672 (D.C.Cir.1987)).

Insofar as the appellant challenges the award to Mercury of the F block license for Lubbock, it meets these requirements. High Plains complains that it was injured because the Commission awarded the license to Mercury, which had violated the anti-collusion rule, instead of holding a new auction in which High Plains could bid free of the illicit influence of reflexive bidding. Further, High Plains has expressed its willingness to bid in a reprise of the vendue for the F block license in Lubbock; and it is obvious that the court could redress High Plains' injuries by ordering the Commission to auction the license anew. High Plains' contentions that Mercury tried to mislead the Commission and to influence the Commission through illicit ex parte contacts also assert a cognizable injury, that of deprivation to a valid, impartial administrative proceeding, which injury this court could redress by reversing the Commission. Accordingly, High Plains has standing to appeal the Commission's award to Mercury of the F block license for Lubbock.

The Commission contends separately that High Plains does not have standing to challenge the award of the 31 other licenses that Mercury acquired in the DEF auction, and High Plains does not counter the Commission's argument. We agree with the Commission (as does the intervenor, not surprisingly). High Plains did not compete against Mercury for those licenses. Nor does it allege that the award of those licenses somehow deprived it of a valid auction process with respect to the lots for which it did bid. It follows that denying those 31 licenses to Mercury will not redress the injury that High Plains suffered in its attempt to acquire the F block license in Lubbock. Accordingly, we hold that High Plains' challenge to the award of licenses other than the F block license in Lubbock is not within the jurisdiction of this court.

Standing aside, Mercury argues that the court lacks jurisdiction over the

entire dispute, but its objections are predicated upon technical and not upon constitutional grounds. Mercury's principal claim is that in order to raise to this court any objection to the award of licenses to Mercury based upon the anti-collusion rule, High Plains should have sought review of the *NALF Rescission* order, which is now barred by the 60–day limitation in the Hobbs Act. *See* 28 U.S.C. § 2344. The point is not well taken: High Plains could not have gotten review of the *NALF Rescission* because it did not have standing to object to the agency's refusal to sanction Mercury. *See Branton v. FCC,* 993 F.2d 906, 910–11 (D.C.Cir.1993) (citing *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). When the Commission later disposed of High Plains' consolidated applications for review, the company had and took its first opportunity to seek judicial review of the Commission's award of the Lubbock license to Mercury. For the same reason, we reject Mercury's second contention, namely, that High Plains is precluded from asserting its objections in this appeal because it could have done so when the Commission issued the *NALF Rescission* order. *See* Restatement (Second) of Judgments § 28(1).

### B. The Anti–Collusion Rule

High Plains argues that the Commission's decision to award the license to Mercury despite its having violated the anti-collusion rule was "neither plausible nor reasonable." We understand High Plains to object to the decision under two theories: First, that the Commission erred in holding the rule against collusion too ambiguous to put Mercury on notice reflexive bidding was a violation; and, second, that the Commission unreasonably departed from a putative policy making violation of the rule a ground for forfeiture.

As for the first theory, our review is deferential: the agency's interpretation of its own rule is given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Capital Network Sys., Inc. v. FCC,* 28 F.3d 201, 205 (D.C.Cir.1994). The issue for the court, then, is whether the Commission plainly erred or contravened the rule against collusion when it read the rule as not providing notice that reflexive bidding was prohibited. Here is the rule in relevant part:

> [A]fter the short-form application filing deadline, all applicants are prohibited from cooperating, collaborating, discussing or disclosing in any manner the substance of their bids or bidding strategies ... with other applicants until after the down payment deadline....

47 C.F.R. § 1.2105(c)(1) (2000). Plainly, the rule does not refer specifically to reflexive bidding. To engage in reflexive bidding, however, is to "disclos[e] ... bidding strategies," and Mercury unquestionably did that during the period covered by the rule. Therefore, the rule probably did prohibit Mercury's conduct, but that is not the question before the court. Our task is to determine only whether the Commission reasonably could conclude the rule failed to put Mercury on notice that reflexive bidding was impermissible.

The Commission itself did not anticipate that participants might collude through the bidding process. After High Plains filed its emergency motion to prevent Mercury from bidding for licenses at the auction, for example, the WTB declared that it had "reached no determinations on the merits of [the] argument" that reflexive bidding violated the anti-collusion rule. *NALF Rescission,* 13 F.C.C.R. 23755 at ¶ 10 n. 20. As the Commission later noted, this "neutral pronouncement immediately following the initial allegation of reflexive bid signaling could reasonably

have been interpreted by auction participants as indicative of an undefined position on whether reflexive bid signaling was covered under the anti-collusion rule." *Id.* at ¶ 10.

To the extent the Commission ever contemplated that participants would convey information about their bidding strategies through the act of bidding, it considered the exchange of information to be a virtue of the open auction. *See 2d R&O,* 8 F.C.C.R. 7700 at ¶ 83 ("Multiple round bidding provides information about other bidders' estimates of common values, allowing all bidders to improve their estimates of these common values."). The Commission did anticipate that an auction with multiple rounds of bidding might increase the opportunity for collusion, but only because the regime could facilitate enforcement of collusive agreements reached elsewhere, *see id.* at ¶ 85 ("Using a single sealed bid could reduce the likelihood of such collusive behavior since it provides colluding bidders greater incentive to defect"), not because the participants could use the open, iterative bidding process itself to collaborate. Not until after the DEF auction was over did the Commission identify the sorts of disclosure that, if encoded within a bid, would violate the anti-collusion rule. *See NALF Order,* 12 F.C.C.R. at 17981 (concurring statement of Commissioner Ness).

In sum, whether reflexive bidding violated the rule against collusion appears to have been an unsettled — indeed, an unasked — question before the DEF auction. In this circumstance it was not unreasonable for the Commission to have deemed the rule ambiguous with respect to whether reflexive bidding was prohibited.

■ Having determined that the Commission reasonably deemed the anti-collusion rule ambiguous, we may dispose in short order of High Plains' argument that the Commission nevertheless erred in

awarding to Mercury the licenses for which it had bid using that tactic. That the rule did not afford adequate notice reflexive bidding was unlawful is itself sufficient justification for the Commission not to penalize Mercury. *See Satellite Broad. Co., Inc. v. FCC,* 824 F.2d 1, 3 (D.C.Cir. 1987) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule").

■ High Plains' other arguments — for example, that Mercury's use of reflexive bidding makes it unfit to hold a license from the Commission — misconceive the relationship between the court and the Commission. We do not review the decisions of the agency de novo. We inquire whether Commission action was arbitrary and capricious, an abuse of discretion, or otherwise contrary to law; and we uphold the agency's decision when it is reasonable. *See Global NAPs, Inc. v. FCC,* 247 F.3d 252, 257–58 (D.C.Cir.2001). Therefore, we reject summarily the appellant's other arguments; aimed only at showing the agency was wrong, they have not the power to persuade that the agency was unreasonable.

C.   The Ex Parte Rules

■ With certain exceptions clearly not applicable here, the Commission prohibits "ex parte presentations" during the pendency of an administrative adjudication and any subsequent judicial review. 47 C.F.R. § 1.1208. The regulations define a "presentation" as a "communication directed to the merits or outcome of a proceeding." *Id.* at § 1.1202(a). A written presentation is "ex parte" if it is "not served on the parties to the proceeding." *Id.* at § 1.1202(b). Thus, a written presentation comes within the prohibition of the rules

only if it is both "directed to the merits or outcome of a proceeding" and "not served on the parties." Responsibility for a violation of the ex parte rules extends to a party that "solicit[s] or encourage[s] others to make any improper presentation," *id.* at § 1.1210, as High Plains alleges Mercury did in this case. *See Freeman Eng'g Assocs. v. FCC,* 103 F.3d 169, 184 (D.C.Cir. 1997) (listing factors that inform the analysis whether a proceeding is "irrevocably tainted" by ex parte contacts and therefore void).

■ High Plains does not identify a single written contact between a Member of Congress and the Commission that meets both criteria. The appellant does refer the court to some congressional letters that arguably called upon the Commission to give Mercury the licenses being withheld during the inquiry into its bidding practices. High Plains also avers that it was not served with copies of certain congressional correspondence, but there is no overlap in the two epistolary lists.

In its brief High Plains also claims it did not receive some of the congressional letters written on behalf of Mercury "until the FCC submitted the Certified List of Items in the Record to the Court," that is, well after the Commission had closed its inquiry into Mercury's bidding practices. If High Plains did not receive the letters until then, and if the letters addressed the merits of the licensing dispute, then reversal of the order and remand to the Commission might have been appropriate. At oral argument, however, High Plains acknowledged that it had received the letters long before the Commission closed the record; indeed, the company attached the letters as exhibits in a proceeding before the Commission more than three years ago. *See* High Plains' Opp. to Mercury's Pet. for Recons. at Exh. C (Oct. 7, 1997).

In the end High Plains has not proffered a single instance in which a congressional contact violated the ex parte rules. We conclude, therefore, that the Commission had substantial evidence that High Plains did not orchestrate a campaign of such contacts.

D.  Candor

■ Finally, High Plains argues that Mercury was not candid with the Commission during the investigation into its bidding tactics, and that its lack of candor disqualifies Mercury from holding a Commission license. The Commission found that Mercury never attempted to mislead the Commission about its having used bids to convey messages; Mercury's defense had always been that the rule against collusion did not prohibit its reflexive bidding.

The gravamen of High Plains' factual claim is that a representative of Mercury falsely declared in a submission to the Commission that Mercury had not "utilized trailing numbers to send secret signals to anyone as alleged by High Plains," and that Mercury had used reflexive bidding only to "bluff or confuse other bidders as to Mercury's overall auction strategy." In a later deposition this same person admitted he used reflexive bidding "to threaten High Plains that I was fixing to come blister their butt in Amarillo." *Mercury,* 15 F.C.C.R. 9654 at ¶ 17 n. 57. The Commission did not consider the apparent contradiction, but neither did the appellant first present it to the Commission. The matter is therefore beyond our ken. *See* 47 U.S.C. § 405(a)(2) (requiring a litigant first to present an argument to the Commission on reconsideration if it "relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass").

High Plains also adduces some lesser inconsistencies in Mercury's submissions

to the Commission as evidence of Mercury's disdain for the truth. Again, however, High Plains attempts to persuade the court that the Commission was wrong, not that it was unreasonable. There being no claims to the contrary, we must conclude that the decision of the Commission is reasonable and is supported by substantial evidence on the record as a whole. *See* 5 U.S.C. § 706(2)(C).

### III. Conclusion

For the foregoing reasons, the decision of the Commission to award to Mercury the F block license for Lubbock is

*Affirmed.*