Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 3, 2002          Decided March 7, 2003

No. 01–1392

BILTMORE FOREST BROADCASTING FM, INC.,
APPELLANT

v.

Federal Communications Commission,
Appellee

Liberty Productions L.P. and
Orion Communications, Ltd.,
Intervenors

————

Appeal of an Order of the
Federal Communications Commission

————

*Donald J. Evans* argued the cause for appellant. With him on the briefs was *Anne Goodwin Crump.*

*Stephen C. Leckar* argued the cause and filed the briefs for intervenor Orion Communications, Ltd.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *Jane E. Mago*, General Counsel, and *C. Grey Pash, Jr.*, Counsel.

*Timothy K. Brady* was on the brief for intervenor Liberty Productions L.P.

Before: GINSBURG, *Chief Judge*, and SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Biltmore Forest Broadcasting FM, Inc. appeals an order of the Federal Communications Commission awarding an FM radio station license to intervenor Liberty Productions L.P., which was the high bidder in the auction of that license. Biltmore and intervenor Orion Communications, Ltd., each of which also bid, claim that Liberty should have been disqualified because errors in Liberty's license application were not correctable after the auction and in its application Liberty had misrepresented facts about its access to a transmitter site. Because neither contention has merit, we affirm the order of the Commission.

## I. Background

In 1987 thirteen radio companies, including Biltmore, Liberty, and Orion, filed applications with the Commission for an FM station license in Biltmore Forest, North Carolina. At that time the Commission's policy was to hold comparative hearings in order to determine the qualifications of the applicants and to decide which of the qualified applicants would best serve the public interest. An Administrative Law Judge held such a hearing and determined that neither Biltmore nor Liberty had a "reasonable assurance" that a transmitter tower site was available to it, as the Commission then required. The ALJ determined also that Liberty had intentionally misrepresented facts about the availability of a site. *Nat'l Communications Indus.*, 5 F.C.C. Rcd. 2862 (ALJ 1990).

The following evidence was before the ALJ when he made his finding concerning Liberty's misrepresentation. Valerie Klemmer, the general partner behind Liberty, certified that Liberty had a reasonable assurance a certain site was available. Klemmer, a neophyte in the broadcasting arena, testified before the ALJ that her certification was based upon a conversation she and a friend named Tim Warner had had on August 25, 1987 with Vickey Utter, the owner of a parcel of land near Biltmore Forest. Warner had had prior dealings with Ms. Utter in his capacity as an executive at WCQS, a public radio station in Asheville. He also had experience certifying that an applicant had a reasonable assurance a site would be available to it. Klemmer believed she had reached an agreement with Utter on August 25. She made no plans to secure any other site for the tower in the event the deal with Utter fell through.

Utter consistently denied having made any deal with Klemmer. In other respects, however, Utter's testimony was most inconsistent. In a February, 1989 affidavit she said she had no knowledge of Klemmer or Liberty and had never given Klemmer or any other representative of Liberty any assurance that her property would be available for a transmitter. Indeed, she denied having spoken to anyone representing Liberty. In a signed statement dated March 13, 1989, however, Utter said that Warner had reminded her that he and Klemmer had visited her and that they had discussed leasing a portion of her land, "but since [Klemmer] never contacted me again I assumed she found some place more suitable for her project." Later in March Utter reiterated her position that she had never given Klemmer any assurance the land would be available, explaining that "[i]f we had discussed this or I had given her this assurance I certainly would have remembered and I would have been looking for her to make a commitment of some sort."

At a deposition in April, 1989 Utter again recalled speaking with Klemmer and Warner, but she could not remember the details of the conversation. She did recall telling Klemmer and Warner about a lease she and Brian Lee, a representative of Orion, had executed on August 21, 1987 for the use of

a portion of her land as a transmitter site. She had signed the February affidavit at the request of Lee, she explained. On March 11, Utter stated, Klemmer and Warner had visited her at her home and refreshed her memory of their earlier meeting. They had wanted her to sign a statement that she would be willing to lease the site to Liberty; Utter had refused but instead wrote and signed the statement of March 13 in which she acknowledged having discussed the matter with Klemmer and Warner in August. Utter stated in her deposition that although at the time she signed the March 13 statement she did not recall ever having discussed leasing her land to Klemmer, she included the assertion that she had done so "because that's what [Warner] kept telling me the night he and [Klemmer] were at the house."

Klemmer testified to a different version of events. She said that at the August meeting she and Warner told Utter of Liberty's interest in leasing a portion of Utter's property in the event Liberty received the license. They discussed a price of $4,000 per year. There was no mention of Utter having entered into a prior lease agreement with Lee or Orion. Klemmer believed her oral agreement with Utter gave her a reasonable assurance of the site being available for two reasons: Warner told her both that Utter had honored previous oral agreements he had made with her on behalf of WCQS, and that he understood from WCQS's attorney that an oral agreement was sufficient for an applicant to certify having a reasonable assurance. In his testimony Warner corroborated Klemmer's account of their meeting with Utter and the two statements she attributed to him.

Upon this record the ALJ made findings adverse to Liberty. In particular, the ALJ concluded that Klemmer had "absolutely no basis" for representing that she had obtained a reasonable assurance the Utter site was available to Liberty. Further,

> she knew she had no basis for [doing so]. To argue that her feeble, half-hearted effort to obtain some of Vicki Utter's land ... constitutes "reasonable assurance" strains credulity. No, Valerie Klemmer has blatantly

> dissembled in a manner that doesn't befit a prospective broadcast permittee.

5 F.C.C. Rcd. at 2879 ¶ 8. The ALJ did not address Warner's testimony at all.

Various parties appealed the ALJ's decision to the Review Board, which affirmed that Liberty was disqualified on the site issue and therefore did not reach the misrepresentation issue. *Nat'l Communications Indus.*, 6 F.C.C. Rcd. 1978, ¶ ¶ 8-12 (Rev. Bd. 1991). The Board's decision survived review by the full Commission as well as two petitions for reconsideration. *Nat'l Communications Indus.*, 7 F.C.C. Rcd. 1703, ¶ 2 (1992); *Liberty Prods., L.P.*, 7 F.C.C. Rcd. 7581, ¶ 36 (1992); *Liberty Prods., L.P.*, 8 F.C.C. Rcd. 4264, ¶ 4 (1993). When the appeal reached this court, however, we summarily reversed and remanded the case to the Commission for reconsideration, *Biltmore Forest Broad. FM, Inc. v. FCC*, 1994 WL 116196 (Mar. 15, 1994), in light of our intervening decision in *Bechtel v. FCC*, 10 F.3d 875 (1993); there we had held the Commission's "integration policy," which favored an applicant who intended personally to manage and operate the proposed station over one who intended to entrust its operation to employees, was arbitrary and capricious. As a consequence, the ALJ's disqualification of Liberty and Biltmore for want of an available site was never reviewed by the court, and the ALJ's disqualification of Liberty for misrepresentation was never reviewed at any level – not by the Review Board or the Commission or the court.

Before the Commission reconsidered on remand which of the applicants would best serve the public interest, however, the Congress authorized the Commission to award licenses for FM stations upon the basis of competitive bidding, Balanced Budget Act of 1997, Pub. L. No. 105-33, § 3002, 111 Stat. 251, 258-65, and the Commission adopted a method of doing so using auctions. *Implementation of Section 309(j) of the Communications Act*, 13 F.C.C. Rcd. 15920 (1998), *on recon. at* 14 F.C.C. Rcd. 8724 (1999), *aff'd sub nom. Orion Communications, Ltd. v. FCC*, 213 F.3d 761 (D.C. Cir. 2000).

On July 9, 1999 the Commission announced the requirements and procedures for bidding in Auction No. 25, which would include the FM license at Biltmore Forest. Public Notice, 14 F.C.C. Rcd. 10632. Among other things, the July 9 Notice announced the starting date of the auction (September 28, 1999), *id.* at 10633, the deadline for the submission of short form applications (August 20, 1999), *id.*, and the various showings and certifications required of each applicant. *Id.* at 10641. Liberty timely filed its short form application but failed to certify its "compliance with the Commission's policies relating to media interests of immediate family members." *Id.*

On September 10, 1999 Liberty arranged to borrow a large sum of money from Cumulus Broadcasting, a nationwide media company. It reported the loan agreement to the Commission on September 27. *Liberty Prods., L.P.*, 16 F.C.C. Rcd. 12061 ¶ 23 (2001). The auction began on September 28 and lasted until October 8. Liberty was the high bidder, followed by Biltmore and Orion. *Id.* ¶ 5. On November 10 Liberty amended its application to include details of the Cumulus loan agreement. *Id.* ¶¶ 6, 23. On November 24 it provided the "family certification" to the Commission. *Id.* ¶ 17.

Because Liberty was the high bidder, the Commission on November 23 recommenced its proceeding "to consider the ALJ's previously unreviewed findings on the false certification issue." *Id.* ¶ 4. In the order now under review, the Commission reviewed the question of Liberty's misrepresentation and addressed Biltmore's and Orion's new charges that Liberty had engaged in irregularities in the auction process.

The Commission held that Liberty's failure to submit the family certification with its short form application did not require dismissal of its application or invalidation of its selection as the permittee on the basis of the auction, *id.* ¶¶ 14-19, and that the loan agreement between Liberty and Cumulus did not improperly bring a new party into the auction. *Id.* ¶¶ 26-28. The Commission also held that Liberty, by entering into the loan agreement with Cumulus, was no longer

eligible for the "new entrant bidding credit," *id.* ¶¶ 32-37, pursuant to which a company without major media interests was not required to pay the full amount of its bid. And the Commission rejected the suggestion that Liberty's becoming ineligible for the bidding credit required it either to dismiss Liberty's application or to set aside the results of the auction. *Id.* ¶¶ 38-39. Finally, the Commission reversed the ALJ's finding that Liberty had misrepresented the availability of the proposed transmitter site in its 1987 application. *Id.* ¶¶ 49-72.

Having found no reason to disqualify Liberty, the high bidder in the auction, the Commission awarded it the license. Biltmore appealed, Orion intervened in support of Biltmore, and Liberty intervened in support of the Commission.

## II.   Analysis

Biltmore's and Orion's objections to the Commission's award of the license to Liberty are of two types: claims that Liberty's failure to adhere to all the rules of the auction disqualifies it from holding the license, and claims that Liberty engaged in misrepresentation before the Commission and is therefore unfit to be a licensee.

### A.   Auction Violations

Biltmore claims that both Liberty's failure timely to file the family certification and its entering into the loan agreement with Cumulus disqualify it from the auction.*

### 1.   Family certification

Biltmore argues that both the July 9 Notice and the Commission's regulations require that Liberty's application

---

* Intervenor Orion also argues the Commission arbitrarily and capriciously refused to determine whether the Cumulus loan amounted to a change in ownership that would disqualify Liberty under 47 U.S.C. § 309(*l*)(2). Because no party raises this argument, it is not properly before the court, and we shall not consider it. *See Lamprecht v. FCC*, 958 F.2d 382, 389 (D.C. Cir. 1992) ("Except in extraordinary cases . . . intervenors may only join issue on a matter that has been brought before the court by another party").

8

be dismissed for failure to file the required family certification.* The July 9 Notice stated that "Bidders must certify . . . compliance with the Commission's policies relating to media interests of immediate family members," 14 F.C.C. Rcd. at 10641, and 47 C.F.R. § 73.5002(b) requires that the short form application contain "all required certifications, information and exhibits, pursuant to the provisions of 47 C.F.R. 1.2105(a) and any Commission public notices."

Regarding the effect of an applicant's failure to submit required information, 47 C.F.R. § 1.2105(b) provides two different sanctions. First, § 1.2105(b)(1) states:

> Any short-form application . . . that does not contain all of the certifications required pursuant to this section is unacceptable for filing and cannot be corrected subsequent to the applicable filing deadline. The application will be dismissed with prejudice and the upfront payment, if paid, will be returned.

Other omissions are not subject to such Draconian treatment, however. Section 1.2105(b)(2) provides: "The Commission will provide bidders a limited opportunity to cure defects specified herein (except for failure to sign the application and to make certifications) and to resubmit a corrected application." The Commission's grace is not unlimited; if the applicants "fail to correct defects in their applications in a timely manner as specified by public notice," then they "will have their applications dismissed without opportunity for resubmission." § 1.2105(b)(3). As for the July 9 Notice, it states only that "[f]ailure to submit required information by the resubmission date will result in dismissal of the application and

---

* Liberty responds with the claim that it was not subject to this filing requirement because "there could be no certification of compliance as to interests which were nonexistent." We shall not consider this attempt by intervenor Liberty obliquely to appeal the Commission's decision that Liberty was required to file the certification. To contest this aspect of the Commission's decision, Liberty should have filed a conditional cross-appeal. *See generally* 15A Charles A. Wright et al., Federal Practice & Procedure § 3902, at 78-79 (1992) (collecting cases).

inability to participate in the auction. *See* 47 C.F.R. § 1.2105(b)." 14 F.C.C. Rcd. at 10697.

The Commission argues that neither 47 C.F.R. § 1.2105(b) nor the Notice requires Liberty's disqualification: The regulation applies by its terms only to "the certifications required pursuant to this section." Because the family certification was required by the July 9 Notice rather than by § 1.2105, according to the Commission, the disqualification provided in § 1.2105(b)(1) does not apply to the omission of that certification. Rather, the applicable provisions are the more forgiving §§ 1.2105(b)(2)-(3), which afford an applicant the opportunity to make corrections before the Commission dismisses its application with no opportunity for resubmission. The parenthetical exception in subsection (b)(2) taking "failure to ... make certifications" out of the class of "defects" curable under that subsection does not apply to the family certification, the Commission's argument suggests, because the "certifications" in question are only those implicated in subsection (b)(1), namely "the certifications required pursuant to" § 1.2105.

As for the July 9 Notice, the Commission contends it simply is not clear enough to require Liberty's automatic disqualification for failure to submit the family certification: Although the Notice stated that a bidder that failed to submit "required information" before the auction would be "[unable] to participate in the auction," it did not state that such an omission was incurable if it came to light after the auction was held. Because the Notice did not directly speak to Liberty's situation, the Commission goes on, disqualifying Liberty based upon the Notice would deprive it of fair warning that its application might be disqualified without an opportunity to correct it, contrary to the rule we endorsed in *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 607 (2002) ("That the rule did not afford adequate notice reflexive bidding was unlawful is itself sufficient justification for the Commission not to penalize [the bidder]").

We give "controlling weight" to the Commission's interpretation of its own regulation "unless it is plainly erroneous or

inconsistent with the regulation." *Id.* at 606. Here the Commission's interpretation does not fall below that standard. The Commission is, of course, correct in pointing out that the family certification is not among those required pursuant to § 1.2105, the omission of which incurably disqualifies the applicant as specified in § 1.2105(b)(1). It was not unreasonable for the Commission to treat the omission of a certification required only by a public notice as a "defect[ ]" other than "failure to . . . make [a] certification[ ]" as that term is used in § 1.2105(b), and thus to provide the opportunity for correction that § 1.2105(b)(2) allows for such a defect. We also agree with the Commission that it should not – more properly, that it need not – disqualify Liberty after the auction on the basis of an omission that, according to the Notice, would disqualify an applicant if discovered prior to the auction.

Biltmore's arguments to the contrary notwithstanding, neither *McKay v. Wahlenmaier*, 226 F.2d 35 (D.C. Cir. 1955), nor *Superior Oil Co. v. Udall*, 409 F.2d 1115 (D.C. Cir. 1969), requires a different conclusion. In each case we reversed the Secretary of the Interior's award of a lease based upon an incurably defective application. Indeed, in those cases the Secretary had awarded the lease after finding specifically that the defect was incurable. *See McKay*, 226 F.2d at 40 ("The Secretary found that his application was defective and that it was filed in an inherently unfair situation which would have caused it to be rejected had the real situation been disclosed before the drawing"); *Superior Oil*, 409 F.2d at 1119 (quoting the Secretary, "the deficiency in Union's bid cannot be waived, nor can it be supplied after the time for receipt of the bids"). In this case the Commission made the opposite finding: Because the family certification was not required by § 1.2105, the omission could be cured. Hence, *McKay* and *Superior Oil* are not controlling.

2. Loss of bidding credit

Section 1.2105(b)(2) provides that "[m]ajor amendments cannot be made to a short-form application after the initial filing deadline," and states that such amendments include

"changes in an applicant's size which would affect eligibility for designated entity provisions." Similarly, the July 9 Notice, citing this provision, stated that "[a]s described more fully in the Commission's Rules, after the . . . short-form filing deadline . . . . [a]pplicants will not be permitted to make major modifications to their applications (*e.g.*, . . . change bidding credits)." 14 F.C.C. Rcd. at 10644.

Biltmore claims that because Liberty's amendment (after the filing deadline) of its short form application to reflect the loan from Cumulus affected its eligibility for a bidding credit, the change was a "major amendment" and therefore untimely. Further, it argues, allowing the change in bidding credits would affect the integrity of the auction by altering one of its "core circumstances."

The Commission responds that the new entrant bidding credit does not depend upon an applicant's "size" but upon its other attributable media interests; the "size" criterion applies only to the "small business bidding credit," which is based upon the bidder's revenues. *See* 47 C.F.R. §§ 90.810, 90.814. The Commission points out that the definition of a "major amendment" in the regulation, which predates the introduction of the new entrant bidding credit, refers only to certain changes in ownership, certain changes in size, and changes in the intended service areas. 16 F.C.C. Rcd. 12061 ¶ 25. Because the loan from Cumulus did not effect a change in Liberty's ownership or size, the Commission argues, its resulting loss of eligibility for a new entrant bidding credit is not a "major amendment" and therefore does not disqualify it from the auction. As for the July 9 Notice, the Commission argues that it purported merely to restate the regulation. To the argument that the integrity of the auction was undermined by Liberty's loss of the bidding credit, the Commission responds that whereas a post-auction increase in bidding credits may change the "core circumstances" of an auction, a post-auction reduction in such credits does not.*

---

* Liberty adopts the Commission's position but also claims that, because the July 9 Notice specified that attributable interests were to be "determined as of the short form . . . filing deadline – August

The Commission's interpretation of § 1.2105 is neither plainly erroneous nor inconsistent with the regulation. The provision describing major amendments certainly addresses the small business bidding credit, and the Commission reasonably so interpreted it. Whether the provision also applies to other bidding credits, such as that for new entrants, is not clear on the face of the regulation. Although Biltmore argues that for purposes of the new entrant credit we should construe "changes in size" to include the number of media interests attributable to an applicant, we do not think that is the only permissible construction of the regulation. On the contrary, we think the Commission's narrower interpretation of the regulation is quite reasonable. Nor does the July 9 Notice, which specifically referred to § 1.2105 as authority for the proposition that "changes in bidding credits" are major amendments, require (or perhaps even allow) the Commission to treat as a major amendment a change that § 1.2105 does not define as such.

Biltmore argues that the Commission's prior determinations limit its discretion to find that a change in the new entrant credit is not a major amendment. In *Two Way Radio of Carolina, Inc.*, 14 F.C.C. Rcd. 12035, ¶ 8 (1999), the Commission held that

> modification of an applicant's small business status does not constitute a minor change under our competitive bidding rules, and that providing Two Way Radio with more favorable financial benefits after the close of the auction, based on information not available to other bidders during the auction, would adversely affect the integrity of the auction process.

The rationale for the holding was that "other bidders placed bids based upon their understanding of the specific bidding credit and the type of installment payment plan to which Two

---

20, 1999," 14 F.C.C. Rcd. at 10639, whereas the loan from Cumulus was effective after that date, Liberty should not have been denied the bidding credit. Because no party appealed that determination, however, Liberty's claim is not properly before the court. *See* p. 8, above, at n.*.

Way Radio, as well as other bidders, were entitled." *Id.* ¶ 9. *See also Clearcall, Inc.*, 12 F.C.C. Rcd. 965 (WTB 1997). The Commission's rationale seems at first blush to apply with equal force to the new entrant credit.

The Commission, however, distinguishes this precedent by pointing out that the proposed amendment in *Two Way Radio* would have increased the applicant's bidding credit, while this case involves an amendment that decreases the applicant's bidding credit. In its Order the Commission stated that it "fail[ed] to see how [Liberty's] mistake would have deprived the other auction participants of information as to Liberty's valuation of the frequency, or would have otherwise influenced their bidding strategies." 16 F.C.C. Rcd. 12061, ¶ 39.

Nor do we see any such problem. Indeed, it is not clear to us – and the Commission does not explain – why even a post hoc increase in bidding credits would raise a question about the integrity of an auction. But the Commission is under no obligation in this case to justify its holding in *Two Way Radio*, whereas Biltmore has the burden of persuading us that Liberty's post-auction loss of the bidding credit was, as the Commission said of the change in *Two Way Radio*, prejudicial to other bidders. To the extent Biltmore claims it was prejudiced because, if it had "known that it was bidding with cheaper dollars than Liberty, it might very well have been willing to press the bidding higher," it makes no sense: Liberty's cost could not rationally affect Biltmore's willingness to pay. Accepting for the sake of the argument Biltmore's suggestion that Liberty might "not have bid as high as it did if it had known that it was paying full dollars," we see only that Liberty's error may have been costly to it, not that it could "adversely affect the integrity of the auction process," *Two Way Radio*, 14 F.C.C. Rcd. ¶ 8.

B. Misrepresentation

Biltmore next claims the Commission was not free to reject the ALJ's finding that Liberty misrepresented facts about the availability of a transmitter site. The appellant maintains that because the Commission did not disturb that finding on

its initial review, it became the law of the case. Biltmore also claims the ALJ's finding is entitled to special deference, and that in any event the Commission's contrary finding that there was no misrepresentation is not supported by substantial evidence. None of these claims has any merit whatsoever.

1. Law of the case

Biltmore argues first that the Review Board's decision, 6 F.C.C. Rcd. 1978 (1991), acted to affirm the ALJ's finding of misrepresentation. Here it points to the statements in the Commission's first decision on reconsideration, 7 F.C.C. Rcd. 7581 (1992), that Liberty's application for review of the misrepresentation finding had been denied "without specifying reasons" and its petition for reconsideration raised only matters that had been "already considered and rejected without comment." *Id.* ¶ 36. Biltmore claims the ALJ's finding therefore became the law of the case and the Commission could not later reverse it.

The Commission, joined by Liberty, responds that this argument is not properly before the court because Biltmore did not raise it before the Commission. Not so. Although Biltmore argued before the Commission first that it should review and adopt the ALJ's findings, it did argue in the alternative that the ALJ's findings were the law of the case. *See* BFB Opp. to Supp. Brief at 2, 4. We therefore go to the merits of Biltmore's law of the case argument.

The Review Board expressly found it unnecessary to reach the misrepresentation issue once it had held Liberty was disqualified "on the site issue." 6 F.C.C. Rcd. 1978, ¶ 12. For the same reason the Commission, on appeal, had no reason to consider and to reject Liberty's claim that the ALJ had erred in finding a misrepresentation in its application. Biltmore is simply mistaken, therefore, in suggesting that the Commission adopted the ALJ's misrepresentation finding. For the record, we note also that the law of the case doctrine is of uncertain force in the context of administrative litigation. *See Lockert v. U.S. Dep't of Labor*, 867 F.2d 513, 518 (9th Cir. 1989) ("[I]t is doubtful that federal courts have the authority

to extend the law of the case doctrine to proceedings involving non-judicial decisionmakers").

### 2. Deference to the ALJ's credibility findings

Next Biltmore, now joined by Orion, argues that the ALJ's finding that Klemmer "strain[ed] credulity" and "blatantly dissembled" is a credibility determination to which we must give special deference on review. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951) ("The significance of [the ALJ's] report, of course, depends largely on the importance of credibility in the particular case"). They maintain that the ALJ must have based his finding upon Klemmer's demeanor, which of course defies appellate inspection. *See United States v. Zeigler*, 994 F.2d 845, 849 (D.C. Cir. 1993). The Commission and Liberty, on the other hand, argue the ALJ's finding reflects not his assessment of Klemmer's and Warner's credibility but rather his ultimate judgment on the issue whether Klemmer had misrepresented the availability of a transmitter site. Similarly, they claim it was the proposition that Klemmer had a reasonable assurance the Utter site was available to Liberty, rather than Klemmer's testimony, that "strain[ed] credulity."

As the Commission emphasizes, the important issue in the misrepresentation inquiry was not whether Klemmer had a reasonable assurance, but whether she was lying when she said she had a reasonable assurance. Indeed, the ALJ's entire discussion of the misrepresentation issue focuses upon the inadequacy of Klemmer's efforts to secure a site, as compared to the efforts Utter expected her to make (and the efforts Lee did make). 5 F.C.C. Rcd. at 2866-67 ¶ ¶ 36-51, 2879 ¶ 8. The ALJ seems to have reasoned that any reasonable person would know the effort Klemmer made was inadequate, so Klemmer must have been lying when she said she thought it was adequate. Nowhere does the ALJ directly attack Klemmer's testimony that she believed at the time that her efforts were adequate, let alone attribute such disbelief to his interpretation of her demeanor. Instead, his appeal is to other evidence in the record, and we owe no special deference to the ALJ's interpretation of the record.

3. Substantial evidence for the Commission's finding of no misrepresentation

Finally, Biltmore and Orion argue that the Commission's finding Liberty did not misrepresent the facts in its application is not supported by substantial evidence in the record. *See* 5 U.S.C. § 706(2)(E); *Contemporary Media, Inc. v. FCC*, 214 F.3d 187, 194 (D.C. Cir. 2000). Commission precedent establishes that misrepresentation can be either intentional or grounded in "an indifference and wanton disregard for the licensee's obligations to the Commission that is equivalent to an affirmative and deliberate intent." *Liberty Cable Co., Inc.*, 15 F.C.C. Rcd. 25050, ¶ 50 (2000) (quoting *RKO General, Inc. v. FCC*, 670 F.2d 215, 225 (D.C. Cir. 1981)).

Under either approach there is substantial evidence to support the Commission's finding that Klemmer did not misrepresent Liberty's situation. Klemmer's testimony was that Warner, who she had reason to believe was knowledgeable about such things, told her that an oral agreement with Utter would suffice to constitute a reasonable assurance of having a transmitter site. She further testified that she believed she had reached such an oral agreement, and she described a meeting that the Commission could reasonably accept as justification for that belief. Although Utter gave a different account of the meeting, her testimony was internally inconsistent and the Commission need not have credited it. In sharp contrast, Klemmer's testimony was consistent and corroborated by that of Warner. Although Warner was a friend of Klemmer's, that is not enough, contrary to Orion's suggestion, to require that the Commission discount his testimony. The testimony of Klemmer and Warner is surely sufficient to support the Commission's finding that Klemmer believed she had a reasonable assurance that Utter's site was available to Liberty.

III. Conclusion

For the foregoing reasons the Commission's order awarding the license to Liberty is

*Affirmed.*